AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

US DISTRICT COURT
WESTERN DIST ARKANSAS
FILED

for the

Western District of Arkansas

JUN 1 3 2022

JAMIE GIANI, Clerk

By _____
Deputy Clerk

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 5:22cm22 |
| 605 SW Loudon Drive Unit 1, Bentonville, Arkansas, 72712 | ) ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Described in Attachment A

located in the _____Western_____ District of _____Arkansas_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Described in Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 (a)(1); 21 USC 846; and 18 USC 1956 | Conspiracy to Possess a Controlled Substance with Intent to Distribute; and Money Laundering |

The application is based on these facts:

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA TFO David Arriaga
*Printed name and title*

Sworn to before me and signed in my presence.

Date: June 13, 2022 @ 1:41pm

_____
*Judge's signature*

City and state:  Fayetteville, AR

Hon. Christy Comstock, US Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

### INTRODUCTION AND AGENT BACKGROUND

I, **Task Force Officer David Arriaga**, with the Drug Enforcement Administration ("DEA"), being duly sworn, depose and state that:

I am a Task Force Officer ("TFO") with the DEA and have been so assigned since January 2021. Within the DEA, I am assigned to the Central Ohio Cyber Drug Task Force (COCDTF) in Columbus, Ohio, where I am responsible for conducting narcotics investigations involving Dark Web marketplaces and narcotics shipments purchased on the Internet in coordination with other Agents and Task Force Officers. My home agency is the Franklin County Sheriff's Office, where I have been employed for 15 years. In my employment with the Franklin County Sheriff's Office, I have been assigned to the Special Investigation Unit (SIU) for the last 7 years. My previous assignment within the Special Investigations Unit was with the Internet Crimes Against Children (ICAC) Task Force from September 2015 to January 2021. While I was assigned the ICAC Task Force, I was cross designated as a Task Force Officer with the Department of Homeland Security Investigations (HSI). During this time, I have conducted investigations for several Ohio County Prosecutors Offices and the Southern District of Ohio. I have testified as an investigator, witness, and subject matter expert in Franklin County Ohio Common Pleas Court. Additionally, I am a Certified Digital Forensics Examiner, certified in conducting digital forensic examinations on mobile devices, computers and associated digital storage devices. I have testified in court proceedings as a subject matter expert in digital forensics. As a DEA Task Force Officer, I am authorized to investigate violations of the laws of the United States and to execute warrants issued under the authority of the United States. While working for the Franklin County Sheriff's Special Investigations Unit and DEA, I have been

involved in narcotics-related arrests, executed search warrants that resulted in the seizure of narcotics, and participated in narcotics investigations. I have participated in and conducted numerous investigations of violations of various state and federal criminal laws, including violations of Title 21 of the United States Code.

The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

This affidavit is made in support of an application to search the property located at **605 SW Loudon Drive Unit 1, Bentonville, Arkansas, 72712** (the "Subject Premises"), for fruits, evidence, and instrumentalities of violations, namely conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 841, 21 U.S.C. § 846, and money laundering 18 U.S.C. § 1956.

## PREMISES TO BE SEARCHED

The Subject Premises to be searched is located at **605 SW Loudon Drive Unit 1, Bentonville, Arkansas, 72712, County of Benton.** The Subject Premises consists of a two-story (no basement) townhouse residence containing an attached single vehicle garage, a concrete driveway and front and back yards.   The outside walls of the residence are constructed with brown brick with a brown front door along with a brown garage door. The Subject Premises is the residence of Mark MARLEY and Tracy MARLEY.

## BACKGROUND ON THE DARK WEB & CRYPTOCURRENCY

Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions:

a.      The "dark web" and/or "Darknet" is a portion of the "deep web[1]" of the Internet, where individuals must use an anonymizing software or application called a "darknet" to access content and websites.  Within the dark web, criminal marketplaces operate, allowing individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous materials, with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply the "web"). These online market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring. Famous dark web marketplaces ("DWM's"), also called Hidden Services, such as Silk Road 1, Silk Road 2, AlphaBay, and Hansa (all of which have since been shut down by law enforcement), operated similarly to clear web commercial websites such as Amazon and eBay, but offered illicit goods and services.  When law enforcement shut down the four DWM's listed above, they also obtained images of their servers, and law enforcement has been able to mine the data from those sites for information about the customers and vendors who used them.

b.      "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts" on dark web marketplaces. Customers, meanwhile, operate "customer accounts." Vendor and customer accounts are not identified by numbers, but rather monikers or "handles," much like the

_____

[1] The deep web is the portion of the Internet not indexed by search engines. Examples are databases and internal networks belonging to private industry, government agencies, or academic institutions.

3

username one would use on a clear web site. If a moniker on a particular marketplace has not already been registered by another user, vendors and customers can use the same moniker across multiple marketplaces, and based on seller and customer reviews, can become well known as "trusted" vendors or customers. It is also possible for the same person to operate multiple customer accounts and multiple vendor accounts at the same time. For example, based on my training and experience, I know that one person could have a vendor account that he or she uses to sell illegal goods on a dark web marketplace in exchange for cryptocurrency; that same vendor could also have a different customer account that he or she uses to exchange cryptocurrency earned from vendor sales for fiat currency[2]. Because they are separate accounts, a person could use different accounts to send and receive the same cryptocurrency on the dark web. I know from training and experience that one of the reasons dark web vendors have multiple monikers for different vendor and customer accounts, is to prevent law enforcement from identifying which accounts belong to the same person, and who the actual person is that owns or uses the accounts.

c.      "Reshippers" are individuals working for, or with, darknet vendors who manage the reshipping of illegal substances to darknet customers. A reshipper's location is typically chosen to maximize the efficiency of product distribution but may operate anywhere in the world. A reshipper will typically receive bulk drugs and packaging to addresses they control, repackage the drugs into specified amounts, and then mail the drugs to customers at locations and addresses specified by the darknet vendor for compensation in fiat currency, crypto-currency, and/or drug product. A reshipper may have no direct communication with the vendor's customers or associate with the vendor's online presence. A reshipper acts much like a drop

---

[2] Fiat currency is currency created and regulated by a government such as the U.S. Dollar, Euro, or Japanese Yen.

shipper: a form of business where a seller accepts customer orders but does not keep items on hand, and instead transfers the orders and the shipment details to either a manufacturer, or a fulfillment house which then ships the goods directly to the customer.  I know from training and experience that darknet vendors utilize reshippers to distance themselves from their customers and minimize risks associated with darknet drug trafficking.

          d.        The "Tor network," or simply "Tor" (an abbreviation for "The Onion Router"), is a special network of computers on the Internet, distributed around the world, designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and, thereby, the locations and identities of the network's users. Tor also enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network. Such hidden services operating on Tor have complex web addresses, generated by a computer algorithm, ending in ". onion" and can only be accessed through specific web browser software, including a browser known as "Tor Browser," designed to access the Tor network. Examples of hidden services websites are the aforementioned AlphaBay and Hansa. Tor is available on cellphones using the Android and Apple operating systems by installing an application that puts a TOR-enabled internet browser on a user's cellphone, which then routes the phone's IP address through different servers all over the world, making it extremely difficult to track.

          e.        "Cloud storage," is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet.

f.      "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high-speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. *See* 18 U.S.C. § 1030(e)(1).

g.      "Computer hardware," consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including physical keys and locks).

h.      "Computer passwords and data security devices," consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

6

i.      "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

j.      A "hidden service," also known as an "onion service," is website or other web service that is accessible only to users operating within the Tor anonymity network.

k.      The "Internet" is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

l.      "Internet Service Providers" ("ISPs"), are commercial organizations that are in business to provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, email, remote storage, and co-location of computers and other communications equipment.

m.      An "Internet Protocol address" or "IP address," refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet.  Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination.  Most Internet Service Providers ("ISPs") control a range of IP addresses.  IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet.  IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.  ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

7

n.      "Records," "documents," and "materials," include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

o.      "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

p.      A "storage medium" is any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

q.      Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies.  Examples of cryptocurrency are Bitcoin, Litecoin, and Ether. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers.  Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object.  Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries.  Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network.  Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network,

containing an immutable and historical record of every transaction.[3]   Cryptocurrency is not illegal in the United States.

     r.  Bitcoin[4] ("BTC") is a type of cryptocurrency.   Payments or transfers of value made with bitcoin are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity.   As mentioned above, individuals can acquire bitcoin through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), bitcoin ATMs, or directly from other people.   Individuals can also acquire cryptocurrencies by "mining."   An individual can "mine" bitcoins by using his/her computing power to solve a complicated algorithm and verify and record payments on the blockchain.   Individuals are rewarded for this task by receiving newly created units of a cryptocurrency. Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers.   If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity.   Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And while it's not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.

---

[3] Some cryptocurrencies operate on blockchains that are not public and operate in such a way to obfuscate transactions, making it difficult to trace or attribute transactions.

[4] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) to label units of the cryptocurrency. That practice is adopted here.

s. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key or address is akin to a bank account number, and a private key is akin to a PIN number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public address (or "public key") and the private address (or "private key.") A public address is represented as a case-sensitive string of letters and numbers, 26–35 characters long. Each public address is controlled and/or accessed through the use of a unique corresponding private key - the cryptographic equivalent of a password or PIN - needed to access the address. Only the holder of an address' private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address. A private key is permanently associated with a wallet and cannot be changed or deleted.

t. Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering and is an oft-used means of payment for illegal goods and services on hidden services websites operating on the Tor network. By maintaining multiple wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces. As of April 1, 2021, one bitcoin is worth approximately $59,000.00, though the value of bitcoin is generally much more volatile than that of fiat currencies.

u. Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including on a tangible, external device ("hardware wallet"), downloaded on a PC or laptop

10

("desktop wallet"), with an Internet-based cloud storage provider ("online wallet"), as a mobile application on a smartphone or tablet ("mobile wallet"), printed public and private keys ("paper wallet"), and as an online account associated with a cryptocurrency exchange. Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet. Moreover, hardware wallets are located on some type of external or removable media device, such as a USB thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger). In addition, paper wallets contain an address and a QR code[5] with the public and private key embedded in the code. Paper wallet keys are not stored digitally. Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password. Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase). I also know that individuals possessing cryptocurrencies often have safeguards in place to ensure that their cryptocurrencies become further secured in the event that their assets become potentially vulnerable to seizure and/or unauthorized transfer.

v.     Bitcoin "exchangers" and "exchanges" are individuals or companies that exchange bitcoin for other currencies, including U.S. dollars. According to the Department of Treasury, Financial Crimes Enforcement Network ("FinCEN") Guidance issued on March 18, 2013, virtual currency administrators and exchangers, including an individual exchanger

---

[5] A QR code is a matrix barcode that is a machine-readable optical label.

operating as a business, are considered money services businesses.[6]   Such exchanges and exchangers are required to register with FinCEN and have proper state licenses (if required under applicable state law).   From my training and experience, I know that registered money transmitters are required by law to follow Bank Secrecy Act anti-money laundering ("AML") regulations, "Know Your Customer" ("KYC") protocols, and other verification procedures similar to those employed by traditional financial institutions. For example, FinCEN-registered cryptocurrency exchangers often require customers who want to open or maintain accounts on their exchange to provide their name, address, phone number, and/or the full bank account and routing numbers that the customer links to his/her exchange account.   As a result, there is significant market demand for illicit cryptocurrency-for-fiat currency exchangers, who not only lack AML or KYC protocols but often advertise their ability to offer customers stealth and anonymity.  These illicit exchangers often exchange fiat currency for cryptocurrencies, such as by meeting customers in person or by shipping fiat currency through the mail. Due to the illicit nature of these transactions and their customers' desire for anonymity, such exchangers are frequently able to charge a higher exchange fee, often as high as 9-10% (in contrast to registered and BSA-compliant exchangers, who may charge fees as low as 1-2%).

Some companies offer cryptocurrency wallet services which allow users to download a digital wallet application onto their smart phone or other digital device.  A user typically accesses the wallet application by inputting a user-generated PIN code or password.  Users can store, receive, and transfer cryptocurrencies via the application; however, many of these

---

[6] *See* "Application of FinCEN's Regulations to Person Administering, Exchanging, or Using Virtual Currencies," *available at* https://www.fincen.gov/resources/statutes-regulations/guiadance/application-fincens-regulations-persons-administering.

companies do not store or otherwise have access to their users' funds or the private keys that are necessary to access users' wallet applications. Rather, the private keys are stored on the device on which the wallet application is installed (or any digital or physical backup private key that the user creates). As a result, these companies generally cannot assist in seizing or otherwise restraining their users' cryptocurrency. Nevertheless, law enforcement could seize cryptocurrency from the user's wallet directly, such as by accessing the user's smart phone, accessing the wallet application, and transferring the cryptocurrency therein to a law enforcement-controlled wallet. Alternatively, where law enforcement has obtained the recovery seed for a wallet (see above), investigators may be able to use the recovery seed phrase to recover or reconstitute the wallet on a different digital device and subsequently transfer cryptocurrencies held within the new wallet to a law enforcement-controlled wallet.

## BACKGROUND REGARDING COMPUTERS AND THE INTERNET

I have had both training and experience in the investigation of computer-related crimes. Based on my training, experience and knowledge, I know the following:

a.      Computers and computer technology have revolutionized the way in which drug trafficking can be conducted.

b.      The development of the internet, computers and mobile computing devices (smart phones, tablets, and electronic storage media, hereinafter collectively referred to as "mobile devices" or "mobile computing devices") has added to the methods used by drug traffickers to interact with co-conspirators and customers.

c.      Previously, drug traffickers had to rely on personal contact, and telephonic communications in order to sell, trade, or market their drugs for sale. The developments of the computer, mobile computing devices, and the Internet, have also changed that.

d.      The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities.   With a computer or mobile device connected to the Internet, an individual user can make electronic contact with millions of other computer or mobile device users around the world.   Many individual computer users and businesses obtain their access to the Internet through businesses known as Internet Service Providers ("ISPs").   ISPs provide their customers with access to the Internet using wired telecommunications lines, wireless signals commonly known as Wi-Fi, and/or cellular service; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers or cellular network; remotely store electronic files on their customers' behalf; and may provide other services unique to each particular ISP.   ISPs maintain records pertaining to the individuals or companies that have subscriber accounts with the ISP.   Those records may include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, Internet Protocol addresses and other information both in computer data format and in written record format.

e.      These internet-based communication structures are ideal for a darknet drug trafficker.   Having both open as well as anonymous communication capability allows the trafficker to transact drugs and still maintain their anonymity.   Once contact has been established on a darknet market, it is then possible to send messages and conduct drug sales pseudo-anonymously via crypto-currency.   Moreover, the drug trafficker need not use large service providers.   The drug trafficker can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with customers and to distribute drugs.   These communication links allow contacts around the world as easily as calling

next door.   Additionally, these communications can be quick, relatively secure, and as anonymous as desired.   All of these advantages are well known and are the foundation of transactions between darknet customers and traffickers.

f.   As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes.   Storing this information can be intentional, i.e., by saving an e-mail as a file on the computer or mobile device, or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places, such as temporary files or ISP client software, among others.   In addition to electronic communications, a computer user's Internet activities generally leave traces or "footprints" in the web cache and history files of the browser used.   Such information is often maintained indefinitely until overwritten by other data.

g.   The capability of computers, mobile computing devices, and electronic storage devices to store communications, spreadsheets, and images in digital form make them ideal repositories for digital evidence.   The primary electronic storage media used in traditional desktop and laptop computers is known as the hard drive.   Hard drives have grown tremendously within the last several years with the capacity of 1-2 terabytes becoming common.   These drives can store tens of thousands of documents and images at very high resolution.   Modern cell phones have average storage capabilities ranging from 4 Gigabytes to 512 Gigabytes. In addition, most cellular phones have the ability to utilize micro SD cards which can add up to an additional 512 Gigabytes of storage.   Smaller storage devices, such as thumb, jump and flash drives, and cellular phones can easily be concealed and carried on an individual's person.

h.      Storage located in host computers or servers adds another dimension to the equation. It is possible to save a document, process that document on a computer, and to save that document by storing it on a server located in another country. Once this is done, there is no readily apparent evidence at the scene of the crime. Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail. Searching computer systems and electronic storage devices may require a range of data analysis techniques. Criminals can mislabel or hide files and directories, encode communications, attempt to delete files to evade detection, or take other steps to frustrate law enforcement searches. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques appear necessary to locate and retrieve the evidence described in Attachment B.

i.      Common terminology for digital file storage on host computers or servers is known as cloud storage. In cloud computing, cloud storage services work as a network of connected data servers collectively used to allow a user to share and access files across multiple devices. Cloud storage providers own and maintain the offsite servers that make up this network at their data centers. The user has on demand access just as if the digital files were stored on the user's own devices. In addition to allowing the user to access the files from multiple devices, cloud storage eliminates the need for the user to maintain physical storage devices, thus making their personally owned devices appear free of contraband.

## SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS AND MOBILE COMPUTING DEVICES

Searches and seizures of evidence from computers and mobile computing devices commonly require agents to download or copy information from the computers or mobile computing devices and their components, or seize most or all computer items (computer

hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.      Computer storage devices (like hard drives, CD's/DVD's, USB flash drives, flash memory, external hard drives, SD cards, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the list of items authorized to be seized in Attachment B of this warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b.      Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even experts in the forensic examination of computers and mobile computing devices to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since evidence on computers, mobile computing devices and electronic storage media is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

17

c.      In order to fully retrieve data from a computer system or mobile computing device, the analyst needs all magnetic storage devices as well as the central processing unit (CPU). In cases involving drug trafficking, the monitor(s) may be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software, which may have been used to create the data (whether stored on hard drives or on external media).

## SEARCH METHODOLOGY TO BE EMPLOYED

The search procedure of electronic data contained in computer hardware, computer software, memory storage devices and /or mobile computing systems may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

a.      Examination of all of the data contained in such computer hardware, computer software, memory storage devices and /or mobile computing systems to view the data and determine whether that data falls within the items to be seized as set forth in Attachment B;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c.      surveying various files, directories and the individual files they contain;

d.      opening files in order to determine their contents;

e.      scanning storage areas;

f.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

18

g. performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily- available forensic tools. When a person "deletes" a file on a home computer or mobile computing device, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

## BIOMETRIC ACCESS TO DEVICES

This warrant permits law enforcement agents to obtain from the person of Mark MARLEY and Tracy MARLEY (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics

(such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

      a.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

      b.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

      c.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera

then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Trusted Face.

d.      If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

e.      In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

f.      As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the computer devices subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within

21

these computer devices, making the use of biometric features necessary to the execution of the search authorized by this warrant.

g.      I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

h.      Due to the foregoing, if law enforcement personnel encounter any computer devices that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to: (1) press or swipe the fingers (including thumbs) of the device owner to the fingerprint scanner of the computer devices found on the person(s) of Mark MARLEY and Tracy MARLEY; (2) hold the computer devices found on the person(s) of Mark MARLEY and Tracy MARLEY in front of the face of Mark MARLEY and Tracy MARLEY, and activate the facial recognition feature; and/or (3) hold the computer devices found on the person(s) of Mark MARLEY and Tracy MARLEY in front of the face of Mark MARLEY and Tracy MARLEY, and activate the iris recognition

feature, for the purpose of attempting to unlock the computer devices in order to search the contents as authorized by this warrant.   The proposed warrant does not authorize law enforcement to compel that the device owner state or otherwise provide the password or any other means that may be used to unlock or access the computer devices.   Moreover, the proposed warrant does not authorize law enforcement to compel the device owner to identify the specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the computer devices.

## PROBABLE CAUSE

a.        During the month of June of 2021, the Central Ohio Cyber Drug Taskforce (COCDTF) in Columbus, Ohio, consisting of investigators assigned to HSI, the Drug Enforcement Administration (DEA), the United States Postal Inspection Service (USPIS) and the Internal Revenue Service (IRS), received information indicating a darknet vendor using the moniker "DEEMZBEEMZ" is selling N, N-Dimethyltryptamine (DMT) (a schedule I controlled substance) on different darknet marketplaces.   "DEEMZBEEMZ", advertises as shipping DMT within the United States and to international customers.

b.        Open source research determined that "DEEMZBEEMZ" had operated on several Darknet markets since approximately 2013, totaling over 3,000 transactions: Agora Market (881 transactions), Alphabay Market (209 transactions), Evolution Market (255 transactions), Abraxes Market (17 transactions), Dream Market (820 transactions), Silk Road 2 (900 transactions), Traderoute Market (38 transactions), Berlusconi (6 transactions), Apollon (75 transactions), Aurora Market (4 transactions), Torrez Market (241 transactions), ASAP (6 transactions), Incognito Market (1 transaction), and Whitehouse Market (245 transactions). The research also indicated that "DEEMZBEEMZ" prefers The Majestic Gardens which is a

psychedelic discussions and transactions forum in which the membership is closed, and the number of sales is unknown.

c.          On July 13, 2021, members of the COCDTF were conducting blockchain analysis when they discovered 4 transactions conducted on August 3, 2013, and August 4, 2014, from a Bitcoin (BTC) wallet address which is associated with "DEEMZBEEMZ's" Silk Road account, to two different Coinbase wallets; 1PCbRqswbhHEbf8bBV3mJRxSokgMzcUT92 and 1MaqfCNAKCNCuXzW9a9VoRA9Zi9YhRmLnF.   A subpoena was sent to Coinbase for information associated with the two identified Coinbase user wallets.   Coinbase responded to the subpoena with the following information:

          i.          BTC Wallet 1PCbRqswbhHEbf8bBV3mJRxSokgMzcUT92 belongs to Coinbase user Mark Anthony Howe, with a certain date of birth, who lives in Arkansas. The account was created July 14, 2013, and was linked to an Arvest Bank checking account ending in 0229.   Additionally, Coinbase provided the self-generated driver's license photograph taken by the account user. Howe's Arkansas driver's license shows his name as Mark Anthony MARLEY and an address of 2424 N. 50th Street Fort Smith, AR.

          ii.          BTC Wallet 1MaqfCNAKCNCuXzW9a9VoRA9Zi9YhRmLnF belongs to Coinbase user Shelia MARLEY, with a certain date of birth, and with a listed address of 2424 N. 50th Street in Fort Smith, AR 72904.   The account was created on July 27, 2013, is linked to the same Arvest Bank checking account as Howe's.

d.          On August 2, 2021, Central Ohio Cyber Drug Task Force DEA TFO David Arriaga sent a subpoena to Coinbase Inc. for any accounts associated with Mark MARLEY. The Coinbase Inc., subpoena return revealed several accounts associated with Mark

MARLEY.    Account one listed two Bitcoin Wallet addresses, the first wallet is 1PG8u8DxhypZeWjzgDHWiaqFBbkyVQpNVo    and    the    second    wallet    is 1PCbRqswbhHEbf8bBV3mJRxSokgMzcUT92.  The account sold 0.29183716 BTC (valued at 27.88 at the time).  MARLEY last accessed the account on January 1, 2018, from IP address 98.186.77.4.  Account two was created on January 15, 2018, with a username Tracy MARLEY and listed email address of nullx3r0@icloud.com.  The account owner was listed as Tracy MARLEY, with a specific date of birth, and social security number.  The address for the account is listed as 1071 Bliss Street, Centerton, AR 72719 with a phone number of 479-353-0310.  The account has no wallets associated with it along with no transactions. MARLEY last accessed the account on February 12, 2021, from IP address 68.1.228.109. Account three was created on November 10, 2019, with a username Mark MARLEY and listed email address donk4tibbins@secmail.pro.  The account owner was listed as Mark MARLEY with a certain date of birth and social security number. The listed address on the account was 2424 North 50th Street Fort Smith, AR 72904, with a corresponding phone number of 479-653-0981.  The Bank listed on the account was Arvest Bank with the checking account number ending in 4081.  The account lists several Bitcoin Wallets addresses with the last BTC wallet being 3GfRdnGZiEGVeZpfuVivu7f1X1Ks475xg5 dated August 5, 2020.  The account sold 2.90617134 BTC (valued at 23380.42 at the time). MARLEY last accessed the account on August 10, 2020, from IP address 72.204.30.35. Account four was created on November 17, 2017, with the username Mark MARLEY and listed email address of nullx3r0@gmail.com.  The account owner was listed as Mark MARLEY, with a certain date of birth and social security number.  The listed address on the account was 1071 Bliss St., Centerton, AR 72719.  The bank listed on the account was

Arvest Bank with the checking account number ending in 4081. The account lists several different coin wallets including Bitcoin, Litecoin and Cosmos coin. The last LTC Wallet is MCzY5QFyrZgdgoviDHLw9WwG6J7iA4Gt9x dated February 12, 2021, the last BTC Wallet is 1K9EU3xiroamm7bSEeyRhvQ9ZAL6AHPLnq dated February 16, 2021, and the ATOM Wallet is cosmos1z3k4rctassgy89tf3f6f2tr5atcs9txyq9f68m dated February 16, 2021. The account shows it sold 0.48063401 BTC (valued at 9671.43 at the time), the account also sold Bitcoin Cash (BCH) 0.3782776 (valued at 263.48 at the time). The account shows it sold LTC 8.25552836 (valued at 1832.14 at the time) and had one transaction of ATOM 67.571605 (valued at 1672.14 at the time). MARLEY last accessed the account on April 22, 2021, from IP address 68.1.242.24. Account five was created on April 22, 2021, with the username Tracy MARLEY and listed email address of warrick920@gmail.com. The account owner was listed as Tracy MARLEY DOB with a certain date of birth and social security number. The listed address is 605 Southwest Loudon Dr., Bentonville, AR. 72712. The bank listed on the account was Arvest Bank with the checking account number ending in 0562. The account listed wallets from Bitcoin (BTC), Litecoin (LTC), Ethereum (ETH) and Ethereum Classic (ETC). The BTC Wallet is 36aAKVhk358wQkauQKWgkwfuJ6vUs7AsTj on April 22, 2021. The last ETH Wallet is 0xdeE38EEC64f283BC6F94EBDa8Ed3d187cc28dCeD on April 22, 2021. The ETC Wallet on the account is 0xE190291DEDB4749bBBEf9BC1Db6d7a08Cf0C239b dated on May 5, 2021. The last LTC wallet on the account is MTxWNC8TqweYdsTmhVpVjS8ivdGC9xFZW3 dated May 1, 2021. The account shows ETH sold 3.72868886 (valued at 9594.22 at the time), it also shows LTC sold 2.09804406

(valued at 555.66 at the time).  Tracy MARLEY last accessed the account on July 30, 2021, using IP address 107.19.25.81.

e.        Investigative research revealed that Mark MARLEY married Tracy MARLEY in September 2016 and that they are still married living at their residence of 605 SW Loudon Dr., Unit 1, Bentonville, Arkansas.

f.        On August 13, 2021, COCDTF investigators conducted an undercover purchase of DMT from "DEEMZBEEMZ" using cryptocurrency.  The purchase was made from Torrez Market, the purchase was for 1 gram of DMT.  Torrez Market is a Darknet market that investigators have determined "DEEMZBEEMZ" utilizes.  Investigators had the undercover purchase from "DEEMZBEEMZ" sent to a United States Postal Inspection Service (USPIS) controlled address in Columbus, Ohio area.  On August 19, 2021, USPIS Inspectors retrieved a package from the controlled address.  The package had a return label of INT Goods, LLC 1003 N. Cardinal Dr. Rogers, AR 72756.  The package was shipped using EasyPost cryptocurrency labels created on August 16, 2021, which contained Tracking # 9405 5368 9523 2265 1719 51.  The package was seized by TFO Arriaga and transported to the Ohio Bureau of Criminal Investigations (BCI) laboratory for chemical, DNA, and latent print testing.  TFO Arriaga received the laboratory results from the BCI.  BCI found no latent prints on any of the evidence.  BCI did locate DNA from a plastic bag, the DNA was from an unknown female and was placed into the CODIS database by the BCI lab. BCI tested an off-white powdery substance removed from plastic bag inside a white envelope they found the substance to be 1.02 grams of DMT.

g.        On November 9, 2021, COCDTF investigators conducted a second undercover purchase of DMT from "DEEMZBEEMZ" using cryptocurrency.  The purchase was again

made from Torrez Market, and the purchase was for 1 gram of DMT for $91.00, including shipping. Investigators used the same controlled address as the pervious undercover purchase. During the undercover purchase DEA FRO TFO Rankin along with members of the DEA Fayetteville Arkansas Office conducted surveillance on the home of Mark Marley and Tracy Marley at 605 SW Loudon Dr., Unit 1, Bentonville, Arkansas 72712. While conducting the surveillance they witnessed and followed Tracy MARLEY leave the home (the Subject Premises) in a 2017 Black GMC Sierra pickup truck, license plate number 499TRA, and drive to the Bentonville Post Office located at 1706 S. Walton Blvd., Bentonville, AR 72712. TFO Rankin was able to witness and video record Tracy MARLEY place several packages into the blue box at the post office and then drive off.

i.          On November 29, 2021, Columbus USPIS Inspector retrieved the second undercover purchase from the controlled address. The package had a return label of Janes Gifts at 1912 SW Sequoia St., Bentonville, AR 72712. The package was shipped using EasyPost cryptocurrency label created on November 24, 2021, which contained USPS Tracking # 9405 5368 3523 2623 9714 90. The package was seized by TFO Arriaga and transported to the Ohio Bureau of Criminal Investigations (BCI) laboratory for chemical, DNA, and latent print testing. TFO Arriaga received the laboratory results from BCI. Again, BCI found no latent prints on any of the evidence. BCI located DNA from a plastic bag, the DNA was again from an unknown female and was placed into CODIS database by BCI lab. BCI located a yellow powder weighing 1.61 grams and found to be DMT.

j.          On December 13, 2021, TFO Arriaga served a search warrant to Google, LLC. For all information and content associated with email address powdermonk3y@gmail.com belonging to Mark and Tracy MARLEY. The email account has several emails from

28

localbitcoins.com from serval different unknown persons.   The localbitcoin.com emails started October 26, 2016, to October 18, 2017.   Localbitcoin.com is a peer-to-peer exchange platform that trades local currency for Bitcoin.   Localbitcoin.com is known to law enforcement to be used for money laundering by selling Bitcoin from drug proceeds and in return getting U.S. currency.   From October 26, 2016, to October 18, 2017, the MARLEY's sold 44.742890682 Bitcoin for a total of $64,748.06.

k.        On December 1, 2021, DEA TFO Rankin obtained a State of Arkansas search warrant to install and monitor a GPS mobile tracker on the 2017 Black GMC Sierra, license plate 499TRA registered to Tracy MARLEY. On December 7, 2021, members of the DEA Fayetteville Office traveled to 605 SW Loudon Dr. Unit 1, AR and installed the GPS mobile tracker on MARLEY's vehicle 2017 Black GMC Sierra, license plate 499TRA.

l.        On December 9, 2021, TFO Arriaga conducted electronic surveillance on the GPS mobile tracker install on MARLEY's 2017 Black GMC Sierra, license plate 499TRA.   TFO Arriaga observed the truck leave the residence at 9:40 am and arrive at the Bentonville Post Office at 9:45 am.   The truck left the area at 9:49 and continued to a local Wal-Mart.   TFO Arriaga contacted USPIS David Barrett from Little Rock, Arkansas and requested the packages dropped off by the driver of the MARLEY's 2017 Black GMC Sierra be pulled from the post office drop box.   USPIS Barrett was able to contact the Bentonville Post Office and have an employee pull one of the packages the truck dropped off.   USPIS Barrett agreed to conduct a search warrant on the pulled package to examine its contents.   On December 22, 2021, USPIS David Barrett executed a search warrant on the pulled package.   USPIS Barrett sent photos of the content of the package to USPIS Mohamed Sabrah, the content of the

package contained a yellow powder substance which looks substantially like the powder from the undercover buys that COCDTF investigators conducted.

m. During the months of December 2021, January 2022, March 2022, and April 2022, TFO Arriaga conducted electronic surveillance on the GPS mobile tracker install on MARLEY's 2017 Black GMC Sierra, license plate 499TRA.  TFO Arriaga observed the truck go to the post office in Bentonville, AR. in the month of December five times.  In the month of January, the truck went to the post office six times.  In the month of March, the truck went to the post office four times and in April the truck went to the post office 2 times in the beginning of the month. Vendors on the darknet that sell drugs are known to use the United States Postal Service (USPS) to ship drugs all over the United Stated and International Countries.  The GPS mobile tracker ran out of battery on April 13, 2022, and electronic surveillance was no longer conducted.

n. On February 25, 2022, Program Analyst Kimberly Miller of the DEA Fayetteville, Arkansas office sent an administration subpoena to the City of Bentonville Utilities requesting customer information for the following address 605 SW Loudon Dr., Unit 1, Bentonville, Arkansas.  The listed address is the residence of the MARLEY's.  On March 4, 2022, the City of Bentonville replied and sent the utility records which include water, electric, sewer, and garbage.  The electric consumption at the MARLEY's residence from January 18, 2022 through February 17, 2022 was 5526.00 kilowatt hours.  The total amount of the utility bill from January 18, 2022 through February 17, 2022 is $934.14.  The City of Bentonville sent 18 months of consumption records starting on November 18, 2020 through February 17, 2022, the average monthly consumption of electricity from that time period is 4290.1875-kilowatt hours.  The residence of the MARLEY's is a duplex home.  The electric

consumption is very high for a duplex home.  In my training, experience, and work on this investigation, I believe that the high electric consumption is indicative or suggests that the residents of the home are preparing, making and storing a controlled substance.  I believe the Marley's are making and storing DMT inside their residence for the purpose of selling the DMT on the dark web.

o.        On April 6, 2022, COCDTF investigators conducted a third undercover purchase of DMT from "DEEMZBEEMZ" using cryptocurrency.  The purchase was a direct buy from "DEEMZBEEMZ", for 1 gram of DMT for $91.00 U.S. Currency, including shipping. Investigators used the same controlled address as the pervious undercover purchase.  On April 20, 2022, investigators reached out and sent a message to "DEEMZBEEMZ" about not receiving the undercover purchase of DMT.  On April 22, 2022, "DEEMZBEEMZ" sent an encrypted message to investigators stating "My apologies for not getting back to you sooner. I have been unable to access elude.  I was trying to send you an email to tell you that my last batch (which included your order) ended up being bad.  I didn't want to ship a lower than optimal quality product, so I tossed it.  I am currently processing more material from a new source right now.  I have put you down for an extra 50% weight on your order for the long wait.  I hope this helps account for your time."  On May 5, 2022, Columbus USPIS Inspectors retrieved a package from the controlled address.  The package had a return label of FTL Gifts and Apparel 1004 N. Quail Terrace, Rogers, Arkansas 72756.  The package was shipped using EasyPost cryptocurrency labels created on April 26, 2022, which contained Tracking # 9405 5361 0936 1249 5721 84.  The package was seized by TFO Arriaga, inside the package was a white envelope that contained 3.3 grams of suspected DMT.

31

p.        During the third undercover purchase the DEA Fayetteville Residence Office, conducted surveillance on 605 SW Loudon Dr., Unit 1, Bentonville, Arkansas.  On April 8, 2022 at approximately 10:39 a.m., SA Nelson established surveillance on the MARLEY residence and observed the garage door partially open with confined space ventilation ducting positioned under the garage door.  In my training and experience, and work on this investigation, I believe that the ventilation under the garage door indicates a possible lab in the residence for making DMT.  In making DMT, chemicals are used to extract the illegal substance from its plant source.  It is very important to have ventilation while extracting DMT do it having highly flammable vapors.  Without ventilation vapors can accumulate in an unventilated space quickly causing it to be extremely flammable.

q.        The affiant believes based on the investigation thus far, that there is probable cause to believe that a commission of a criminal offense as being described above has been and is being conducted through the residence of Mark and Tracy MARLEY at 605 SW Loudon Dr., Unit 1, Bentonville, Arkansas 72712, the Subject Premises.

## ITEMS TO BE SEIZED

Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of the Subject Offenses, will be found at the Subject Premises described in Attachment A.

## AUTHORIZATION REQUEST

For all of the reasons described above, there is probable cause to believe that evidence of violations for conspiracy to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 841, 21 U.S.C. § 846, and money laundering 18 U.S.C. § 1956, as described above and in Attachment B of this affidavit, incorporated herein by reference, will be

32

found in a search of the Subject Premises, as further described above and in Attachment A of this affidavit.   In addition, there is probable cause to believe that any computer, mobile computing devices and storage devices, the monitor, keyboard, and modem are all instrumentalities of the crime(s), within the meaning of 21 U.S.C. § 841, 21 U.S.C. § 846, and money laundering 18 U.S.C. § 1956, and should all be seized as such.

Respectfully submitted,

_____
David Arriaga
Drug Enforcement Administration, TFO

Subscribed and sworn to before me on _June 13_____, 2022.

_____
CHRISTY D. COMSTOCK
UNITED STATES MAGISTRATE JUDGE
WESTERN DISTRICT OF ARKANSAS

33

## **ATTACHMENT A**

### **Premises to Be Searched**

The Premises to be Searched is the residence located at 605 SW Loudon Dr., Unit 1, Bentonville, Arkansas (Western District of Arkansas), associated curtilage, detached structures, and any and all electronic storage devices located therein to be searched on or offsite. The residence consists of a two-story (no basement) townhouse residence containing an attached single vehicle garage, a concrete driveway and front and back yards. The outside walls of the residence are constructed with brown brick with a brown front door along with a brown garage door. The Subject Premises is the residence of Mark MARLEY and Tracy MARLEY.



**ATTACHMENT B**

**Particular Things To Be Seized**

The items to be seized are fruits, evidence and instrumentalities, as listed below of criminal offenses against the United States, that is of violations of 21 U.S.C. §§ 841 and 846, conspiracy to possess with intent to distribute controlled substances, and violations of 18 U.S.C. § 1956, money laundering. Specifically, the following items are to be seized: articles of personal property tending to establish and document distribution of controlled substances or a conspiracy to do such; as well as documents related to financial transactions involving the proceeds of distribution, including but not limited to the following:

(a)  Materials used to package or ship-controlled substances, and equipment related to the sale, manufacture, processing and storage of controlled substances, including but not limited to all cooking equipment, chemicals, packaging materials, scales, presses, adulterants, diluents, strainers, measuring spoons, scales, grinders, etc.;

(b)  Logbooks, records, payment receipts, notes, and/or customer lists, ledgers and other papers relating to the transportation, ordering, purchasing, processing, storage and distribution of controlled substances, including all records of income and expenses;

(c)  Papers, tickets, notices, credit card receipts, travel schedules, travel receipts, passports, and other items relating to travel to obtain and distribute narcotics and narcotics proceeds. Evidence of such travel is often times maintained by narcotics traffickers in the form of airline receipts, bus tickets, automobile rental receipts, credit card receipts, travel schedules, diaries, hotel receipts, logs, travel agency vouchers, notes, cellular telephone tolls and records of long-distance telephone calls;

35

(d)  Books, records, invoices, receipts, records of real estate transactions, auto titles, financial statements, bank statements, cancelled checks, deposit tickets, passbooks, money drafts, withdrawal slips, certificates of deposit, letters of credit, loan and mortgage records, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, money wrappers, wire transfer applications and/or receipts, fictitious identification, and other items evidencing the obtaining, secreting, transfer, concealment, and/or expenditure of money.  These records should include both records of drug trafficking and legitimate business operations;

(e)  Mobile telephones and/or home telephones and answering machines and any stored electronic communications contained therein;

(f)  United States currency, precious metals, jewelry, gold coins, and financial instruments, including, but not limited to, stocks and bonds;

(g)  Photographs of co-conspirators, assets and/or narcotics, including still photos, negatives, video-tapes, films, slides, undeveloped film and the contents therein;

(h)  Address and/or telephone books, rolodex indices, and any papers reflecting names, addresses, telephone numbers, pager numbers, and fax numbers of co-conspirators, sources of supply, storage facilities, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

(i)  Indicia of occupancy, residency, rental and/or ownership of the premises described above or vehicles located thereon, including, but not limited to, utility and telephone bills, cancelled envelopes, keys, deeds, purchase lease agreements, land contracts, titles and vehicle registrations;

(j)  The opening, search and removal, if necessary, of any safe or locked receptacle or compartment, as some or all of the records and/or property heretofore may be maintained;

(k)   Any and all computers, to also include associated monitors/televisions, key boards, mouse and other accessories, and computing devices and information and/or data stored in the form of magnetic or electronic coding on computer media, on media capable of being read by a computer, or other recorded media.  This includes, but it is not limited to, computer software, software manuals, tapes, CD's, diskettes, stored electronic communications, taped messages, electronic date/memo minders, address books, word processors, passwords, backup storage devices, audio tape and the contents therein, containing the related information generated by the aforementioned electronic equipment;

(l)   Any opened and unopened U.S. Mail parcels;

(m)   The contents of all associated web-based, cloud, Darknet and cryptocurrency accounts accessible through information found on any seized electronic storage devices or paper documents, along with the recovery/recreation of any digital cryptocurrency wallets made possible by locating seed/backup phrases;

(n)   Any other items which constitute evidence of the Subject Offenses, that is, violations of 21 U.S.C. §§ 841 and 846, conspiracy to possess with intent to distribute controlled substances, and also violations of 18 U.S.C. § 1956, money laundering.

## Biometric Access to Devices

During the execution of the search of the Subject Premises described in Attachment A, law enforcement personnel are also specifically authorized to obtain from Mark Anthony MARLEY and/or Tracy MARLEY (but not any other individuals present at the Subject Premises at the time of execution  of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any device requiring such biometric access subject to seizure pursuant to this warrant for

which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the device, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

    (a) any of the devices found at the Subject Premises,

    (b) where the devices are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant Affidavit and warrant attachments, for the purpose of attempting to unlock the device's security features to search the contents as authorized by this warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the devices. Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel Mark Anthony MARLEY and/or Tracy MARLEY to state or otherwise provide that information. However, the voluntary disclosure of such information by Mark Anthony MARLEY is permitted and/or Tracy MARLEY. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any devices, or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any devices, the agents will not state or otherwise imply that the

38

warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.